# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

ROBERT W. LEANNAH, CHARLOTTE L. KOEHLER,
MICHAEL E. ARROWOOD, LAWRENCE R. LENHARDT,
and INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS LOCAL UNION 965,

        Plaintiffs,

    v.                                      Case No. 07-CV-169

ALLIANT ENERGY CORP. and
WISCONSIN POWER AND LIGHT COMPANY,

        Defendants.

_____

# ORDER

After years of allowing early retirees to pay the same health care premiums as active employees, defendant, Alliant Energy Corp ("Alliant"), like so many other companies struggling with the soaring cost of healthcare, sought to reduce these costs by requiring early retirees to pay a higher premium than active employees. IBEW Local Union 965 ("the Union"), which represents Alliant's unionized workers, took exception to this disparity, as did the named plaintiffs, who are among the retirees affected by this change. Plaintiffs, therefore, filed suit on February 22, 2007, pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1)(B) ("ERISA"), and Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185 ("LMRA"), alleging Alliant breached collective bargaining agreements ("CBAs") by raising early retirees' healthcare premiums. The parties thereafter stipulated to class certification, which the court

accordingly certified as: "All former Local 965 Represented employees of Wisconsin Power and Light Company who were participants in the Wisconsin Power and Light Company's Early Retiree health and dental plans as of November 1, 2006 and thereafter, and whose employment terminated due to early retirement between ages 55 and 65." (Order Granting Pls.' Mot to Certify Class at 1-2). Upon completion of discovery, the parties filed cross-motions for summary judgment, which the court will now address.

## I.    FACTS

Wisconsin Power & Light is a wholly-owned subsidiary of Alliant, and is engaged in operating energy production facilities throughout Wisconsin. (DPFOF ¶¶ 1-2). Plaintiffs consist of Wisconsin Power & Light early retirees and the Union, which has a collective bargaining relationship with Wisconsin Power & Light dating back to 1937. (Def.'s Resp. PPFOF ¶ 12). The parties routinely negotiate and enter into CBAs that run for three to four years, after which the parties renegotiate a new CBA which effectively terminates the prior CBA, and governs the parties' contractual relationships until the next CBA is negotiated and agreed upon. Each CBA is divided into two parts: an "Agreement" which sets forth the grievance procedure and is quite general, and a second part called "Exhibit A," which is incorporated by reference into the Agreement, and is much lengthier, containing specific terms and conditions pertaining to union employees. (Id. ¶ 13). After each round of negotiations, the parties jointly prepare and issue a "Report Out" which summarizes the changes to which the parties have agreed upon, and which clarifies old items.

Case 2:07-cv-00169-JPS   Filed 02/26/09   Page 2 of 25   Document 110

(Id. ¶ 14). Together, the "Agreement," "Exhibit A," and "Report Out" form a single CBA contract. All the plaintiffs in this case, save for one,[1] retired while one of four CBAs was in effect. (Dkt #89, Warren Aff. Ex. 54). Those four CBAs are: the 1996 CBA, the 1999 CBA, the 2003 CBA, and the 2007 CBA; the term of each CBA ran from June 1 of the applicable year until May 31 of the year the next CBA was entered into.

Throughout their employment, employees received information pertaining to their healthcare either through reference to their medical plan's governing document, or through summary plan descriptions ("SPDs") issued either as stand alone documents, or contained in "Information Please" booklets distributed by Alliant. Some of these SPDs contained language indicating that early retirees' healthcare coverage would continue until age sixty-five. Specifically, SPDs issued in 1997, 2001, and 2003 for the WP&L Comprehensive Medical Expense Benefits Plan B ("Plan B") stated:

> If you were hired prior to January 1, 1993 and retire before you are 65 years old, you and your eligible dependent(s) continue to receive the same medical coverage as active employees.
>
> If you are covered by an HMO or POS on your early retirement date, you can remain covered by the HMO or POS until the first of the month in which you turn age 65.
>
> If covered by an HMO our POS, your HMO or POS coverage ceases the first of the month in which you turn age 65.

---

[1] One class member, Gene Samuelson, retired during the term of the 1990 CBA, but the same analysis as applies to the other class members applies to Mr. Samuelson as well, given the similarities in the applicable documents.

-3-

(Dkt. #38, Warren Aff. Ex. 10 at 10-11; Ex. 19 at 13; Ex. 20 at 11-12). Similar language appears in other parts of those SPDs, as well as in another SPD issued in 1997. (Id. Ex 9 at 12). However, several other SPDs issued between 2003 and 2007 do not contain similar language. (Dkt. #82 Warren Aff. Exs. 19-26). Certain SPDs issued by CIGNA (a third party administrator of the medical benefits plan) – thus referred to by the parties as the "CIGNA SPDS" – contained the following language:

> Notwithstanding any provision of this Plan to the contrary, you are eligible to continue participating in this Plan upon your termination of employment if you: (i) were covered under this Plan on the date of your termination of employment; (ii) you completed at least ten consecutive years of service with WPL or another Alliant Energy Company; and (iii) you attained age fifty-five on or before the dates of your retirement. If you meet these three requirements you are referred to as an eligible retiree.

(Dkt. #87, Warren Aff., Ex. 23 at 40, Ex. 24 at 38, Ex. 25 at 46). Furthermore, for its part, Plan B, in Section 2.12 defines "Eligible Employee" as including "Retirees until their 65th birthday." (Dkt. #87, Warren Aff., Ex. 29 at 6).

For many years, premium contributions for active employees and early retirees was the same. However, effective January 1, 2007, early retirees were required to pay a higher premium for healthcare coverage than were active employees. That change precipitated this lawsuit, in which the plaintiffs point to the language referencing coverage until age sixty-fie in various SPDs and other documents as evidence that the premium hike was a contractual violation. At the same time,

defendants point to the silence of the CBA as to retirees as evidence that the hike was not a contractual violation.

## II.  ANALYSIS

### A.  Applicable Law

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317.  A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

With this case, which is now before the court on cross motions for summary judgment, the court finds itself in the unfortunate, and all too common, position of being asked to divine the meeting of the parties' minds on a matter on which, it would appear, the parties' minds truly never met.  The predicament is not unlike that of an appellate court asked to interpret a statute, the language of which is only clear

Case 2:07-cv-00169-JPS   Filed 02/26/09   Page 5 of 25   Document 110

in evidencing it was left intentionally vague so as to garner adequate support in the legislature. However, just as a court in that situation would turn to the principles of statutory interpretation for guidance, here the court must turn to the principles of contractual interpretation. Such is the case here since, unlike pension benefits, ERISA does not require the vesting of healthcare benefits, *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005), "if they vest at all, they do so under the terms of a particular contract." *Pabst Brewing Co., Inc. v. Corrao*, 161 F.3d 434, 439 (7th Cir. 1998). If a CBA is silent on the duration of health benefits, then the presumption is that the benefits expire with the agreement. *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 606-08 (7th Cir. 1993) (en banc). To rebut the presumption that all contractual obligations cease upon the expiration of the contract, the contract need not use the word "vest" or state unequivocally that it is creating rights that will not expire when the contract expires. *Bidlack*, 993 F.2d at 607. Rather, the contract may contain language that suggests that the benefits do not expire with the agreement, such as a clause that specifies the duration of the benefits. *See, e.g.*, *Bland*, 401 F.3d at 785-87 (holding that "lifetime" benefits language, in the absence of a reservation of rights clause, creates ambiguity as to vesting); *Vallone v. CNA Financial Corp.*, 375 F.3d 623, 637 (7th Cir. 2004) ("[T]he grant of 'lifetime' benefits would have created an ambiguity allowing [the plaintiffs] a trial and allowing us to examine extrinsic evidence of the parties' intent."). *But see Senn v. United Dominion Industries, Inc.*, 951 F.2d 806, 810, 815 (7th Cir. 1992) (language that the company "will continue" to pay premiums does not create an ambiguity as to vesting). If such

Case 2:07-cv-00169-JPS   Filed 02/26/09   Page 6 of 25   Document 110

an ambiguity is not disambiguated elsewhere in the contract, then the plaintiff is entitled to a trial and the court may consider evidence of the parties' intent that is extrinsic to the written documents. *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 547 (7th Cir. 2000). If, however, the agreement makes clear that the entitlement expires with the agreement (e.g. the agreement states that the benefits shall be provided "during the term of this agreement" or "unless the collective bargaining agreement has expired"), the employee's entitlement expires with the agreement. *Id.* On the other hand, if the agreement unambiguously provides that the benefits vest, the plaintiffs are entitled to a judgment in their favor. *Id.*

The question is essentially one of contract interpretation, and federal principles of contract construction apply. *Bland*, 401 F.3d at 783; *Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 305 (7th Cir. 1996). The court will give contract terms their "ordinary and popular" sense and avoid resorting to extrinsic evidence when faced with unambiguous language. *Diehl*, 102 F.3d at 305. At the same time, the court will interpret potentially conflicting provisions within the same document, or within a single contract formed of several documents, in a manner that reconciles those provisions because a contract should be read as a whole with all its parts given effect. *Diehl*, 102 F.3d at 307; *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir. 1995).

**B.    Application of Law to Facts**

Thus, the first step is to examine the CBAs in question to determine what, if anything, they provide as to the duration of early retiree health benefits. Then the

-7-

court must determine whether the terms of the contract give rise to any latent or patent ambiguities. However, before the court reaches this first step, it must resolve which documents are part of each CBA. As earlier described, it is undisputed that each CBA consists of an "Agreement," an "Exhibit A," and a "Report Out." However, it is also undisputed that none of the CBAs reference retiree health insurance. (Pls.' Br. Supp. Mot. S.J. at 10-11). Thus, for plaintiffs to show that they had a contractual right to health insurance premium parity with active employees, they have to show that the documents that actually reference early retiree health insurance are incorporated into the CBA. For if the SPDs and Plan B document cited above are not incorporated into the CBA, then they have no power to create vested rights. *Bland,* at 783, "if [healthcare benefits] vest at all, they do so under the terms of a particular contract." Yet, it is not enough for plaintiffs to merely show that the SPDs and Plan B document are incorporated into the CBAs, for those same documents also contain reservation of rights clauses (allowing Alliant to unilaterally alter the terms found within). Thus, in order to even get to trial, plaintiffs must show that the SPD and Plan B document language supporting their claim are not clearly subject to the reservation of rights clauses within the same documents. Ultimately plaintiffs' claims fail because: 1) even though the Plan B document and the SPDs are incorporated into the CBAs, those documents, as a result of the reservation of rights clauses, do not evidence ambiguities; and 2) the SPDs and plan documents do not purport to guarantee price parity, but rather only coverage parity (which is not an issue in this case).

-8-

### 1. Incorporation of Plan Document and SPDs

As previously noted, it is undisputed that each CBA consists of an "Agreement," an "Exhibit A," and a "Report Out." However defendants strongly disagree with plaintiffs' assertion that the governing Plan B document and the SPDs are also part of each CBA contract. Plaintiffs maintain that the language of the CBAs incorporates the Plan B document, and thus the SPDs into the CBA contract. The language to which plaintiffs refer is found on the first page of the Agreement portion of each CBA, under the heading "Method of Negotiation and Enforcement" and states:

> Should any differences arise concerning the application and construction of the terms and provisions contained in this Agreement and in the Agreement covering Retirement Plan B and the Equitable Group Annuity Plan (AC-288), the Agreement covering the Comprehensive Medical Expense Benefits Plan, the Agreement covering the Dental Expense Insurance Plan B, and the Agreement covering the Employees' Retirement Savings Plan B -[401(k0] to the extent provided in said other Agreements between the parties hereto they shall be settled in the following manner[.]

(Dkt. #82, Warren Aff., Ex. 3 at 1).[2] Defendants are quick to point out that "[m]ere reference to another contract or document is not sufficient to incorporate its terms into a contract[,] [t]here must be an express intent to incorporate, and there is no such expression here." (Defs.' Br. Opp. Pls.' Mot. S.J.) (quoting *Rosenblum v. Travelbyus.com*, 299 F.3d 657, 666 (7th Cir. 2002)). Defendants support this assertion by juxtaposing the above section of the CBAs to another section of the

---

[2]This is the same language verbatim found in the other applicable CBAs, the only distinction being that the 1996-1999 CBA and the 1999-2003 CBA also reference an agreement covering a vision care plan.

Case 2:07-cv-00169-JPS   Filed 02/26/09   Page 9 of 25   Document 110

CBAs (found on the same page as the above cited section), which states: "All items set forth in Exhibit "A" shall be made a part hereof as fully as if incorporated herein." (Dkt. #82, Warren Aff., Ex.1 at 1).[3] Defendants further point out that this is the type of express language required to evidence the requisite intent to incorporate a document into a contract. Defendants also suggest that this demonstrates that the parties were well aware of how to incorporate other documents into the CBAs if it was their intent to do so. (Defs.' Br. Opp. Pls. Mot. S.J. at 32) (citing *Taracorp v. NL Indus.*, 73 F.3d 738, 744 (7th Cir. 1996) (following the rule of contract interpretation that when the parties use differing language it is reasonable to infer that they intended this language to mean different things). Plaintiffs' attempt to counter this argument by citing to *Matthews v. Wisconsin Energy Corp. Inc.*, 534 F.3d 547, 554-44 (7th Cir. 2008) as an example of the Seventh Circuit finding incorporation, even absent language expressly stating the document in question was to be incorporated. However, the contract in *Matthews* was very different than the contract in this case. The contract in *Matthews* represented a settlement agreement reached between Wisconsin Energy ("WE") and a former employee who had sued WE over unsatisfactory references to would-be employers. The agreement stated:

> [WE] agrees to respond to any request for a reference regarding Matthews in a manner that is consistent with the Wisconsin [Energy] policy in place regarding reference checks at the time. Wisconsin [Energy] will not respond to any request for a reference regarding Matthews by indicating that Matthews was terminated or fired.

---

[3]This is the same language verbatim found in the other applicable CBAs.

-10-

*Id.* at 553. The court held that this passage expressly incorporated WE's reference policies into the agreement. The crucial distinction between the agreement at issue in *Matthews* as compared to the contract in this case is that in *Matthews*, it was impossible to even know what was required of one of the parties to the agreement, WE, without referring to WE's reference policies (the incorporated document). Indeed, the agreement required WE's action to comport with these policies; it is impossible to know whether it does comport or not without looking at what the policies say. Conversely, in the instant case, the only reference to anything pertaining to health benefits simply states that disagreements pertaining to the "Agreement covering the Comprehensive Medical Expense Benefits Plan" are subject to stated grievance procedures, to the extent provided in said other agreements. Unlike in *Matthews*, the only need to refer to the "Agreement covering the Comprehensive Medical Expense Benefits Plan" to understand either parties' obligations arising from the cited passage, is simply to determine what that agreement provides as to grievance procedures. There is no necessity to understand the agreement as a whole. Furthermore, this "Agreement covering the Comprehensive Medical Expense Benefits Plan" that must be referenced in order to determine the extent it provides for grievance procedures is a separate and distinct document from the Plan B governing document. (Dkt. #82, Warren Aff., Ex. 6). Hence, the language found in the "Agreement" section of the CBAs does not incorporate the Plan document or the SPDs into the CBAs, especially considering

the fact that the CBAs clearly demonstrate that the parties were well aware of how to incorporate documents into the contract.

Plaintiffs do not, however, rest their assertion of incorporation solely on the above cited passage. They also state that negotiations about health benefits were an integral part of the negotiations surrounding the forming of each CBA. Plaintiffs assert that prior to 1984 the parties would enter into separate CBAs concerning health insurance, pensions, and other fringe benefits, but that in 1987 the parties decided this was wasteful paperwork, and that negotiated changes to those benefits would be incorporated into the relevant plan documents. (PAPFOF ¶¶ 2-3). Defendants contend that the parties never executed "separate CBAs" pertaining to these benefits; however, "[d]efendants do not dispute that since 1984, the parties have not executed the aforementioned side agreements and that following negotiations, the Company incorporates the agreed upon benefit changes set forth in the Report Outs into the various benefit plans and SPDs." (Defs.' Resp. PAPFOF ¶ 3). It matters not whether the side agreements the parties entered into prior to 1984 were separate CBAs. The fact that changes to health benefits are negotiated during CBA contract negotiations, and then the plan documents are altered to reflect those negotiated changes, means that the court must read the CBA and plan documents together. *See Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 713 n. 13 (7th Cir. 1985) ("Although the franchise agreement is evidenced by five separate documents, they were executed at the same time between the same parties, for the same purpose and as parts of a single transaction, and so are to be read together and

construed as a single contract.").  This court has previously found that "not every CBA is part of the same contract as every insurance document" *Bialoszynski v. Milwaukee Forge,* 419 F.Supp.2d 1045, 1055 n.6 (E.D. Wis. 2006); however, where "the terms of the CBA and the Plan were negotiated and executed" together, and "both the Plan and the CBA rest on the same consideration: the mutual promises set forth in the CBA[,]" the CBA and the Plan "must be read together[.]"  *Murphy*, 61 F.3d at 567; *see also Diehl*, 102 F.3d at 306-07 (determining that a Shutdown Agreement was independent of an insurance agreement because it was supported by separate consideration and not executed in close temporal proximity to the insurance agreement).  Defendants deny this by arguing that the Report Outs evidence that the parties only negotiated over active employee health benefits, not retiree health benefits.  (Defs.' Reply Br. Supp. Mot. S.J. at 5).  This argument misses the point that the Plan B document consists of terms that were negotiated and agreed upon in tandem with the terms of the CBAs, and that the consideration underlying the terms of the CBAs is the same as that underlying the terms of the health benefits plan.  Thus, the entire Plan B document must be read in conjunction with the CBAs.  Additionally, the SPDs, which are summaries of the plan documents, are incorporated into the CBAs.  Plaintiffs ask the court to go so far as to also hold that any correspondence between Alliant and its employees regarding health benefits is also incorporated (Pls.' Br. Supp. Mot. S.J. at 17); however, plaintiffs offer no case law or analysis supporting this position.  Defendants, on the other hand, do offer case law to the contrary.  *Sprague v. General Motors Corp.*, 133 F.3d 388, 403 (6th

-13-

Cir. 1998) (written representations from employer to employees do not modify or supersede Plan document). Accordingly, while the court does find that it must read the SPDs and Plan B document as part of the same contract as each CBA, the court finds no support for the premise that correspondences between the company and employees regarding health benefits are also incorporated.

### 2. Reservation of Rights Clauses

The fact that the Plan B document and the SPDs are incorporated into the CBAs means that those documents are not extrinsic evidence. It also means that the entirety of each contract - consisting of an Agreement, an Exhibit A, a Report Out, plan documents, and SPDs - "should be read as a whole with all its parts given effect." *Bialoszynski*, 419 F.Supp.2d at 1052. For "the court will interpret potentially conflicting provisions within . . . a single contract formed of several documents, in a manner that reconciles those provisions[.]" *Id.* However, if in reading the contract as a whole, and in attempting to reconcile potentially conflicting provisions, the court finds the contract is ambiguous, be it latently or patently, then the court must allow the finder of fact to resolve those ambiguities. In doing so, the finder of fact may consider extrinsic evidence. Plaintiffs argue that the various portions of the Plan B document as well as the SPDs that reference health benefits for early retirees until the age of sixty-five either prove an intent to vest medical benefits, or at least demonstrate ambiguities regarding the matter. However, as the court's following

discussion will show, neither the Plan B document nor the SPDs prove an intent to vest or are ambiguous on the matter.[4]

"A latent ambiguity is an ambiguity (that is, something that makes it possible to reasonably interpret a document in more than one way) that is recognized as such only when a contract clear on its face - clear, that is, to the uninformed reader - is applied to a particular dispute." *Rossetto*, 217 F.3d at 542 (internal citations omitted). However, where even that uninformed reader could read a contract and recognize that it was unclear "without having to know anything about how it interacts with the world - then the contract has what is called a patent, or intrinsic, ambiguity." *Id.* at 543. Plaintiffs point to sections of the Plan B document as evidencing an ambiguity as to the matter of health benefits for early retirees. One such cited section is found on the "Introduction" page of the Plan B document under the subheading "Purpose"; it states: "The purpose of the Plan is to provide Participating Union Represented (IBEW Local 965) Employees, Retirees (under age 65) who were Union Represented (IBEW Local 965) Employees at time of Retirement and the Dependents (under age 65) of such Employees and Retirees with certain medical benefits." (Dkt. #87, Warren Aff., Ex. 29 at 3). Plaintiffs also cite from the "Definitions" section of the document, which in Article 2.12 states: "The term 'Eligible Employee' shall include . . . [r]etirees, until their 65th birthday." (Id. at 6). Lastly, Plaintiffs cite Article 11.7 of the Plan B document which allows surviving spouses of

---

[4]For the sake of efficiency, the court will confine its discussion to whether the cited evidence shows an ambiguity, for if it does not even raise an ambiguity as to whether benefits vested (as the court will show it does not), then by default it certainly cannot prove that benefits did vest.

-15-

"Eligible Employees" to continue being covered, seemingly indefinitely, so long as any number of triggering events do not occur. (Id. at 43-44). These passages, read on their own, do raise questions as to whether early retirees' health benefits were intended to vest.

However, ambiguities should not be deemed to arise from portions of a contract being read on their own, but rather from a contract being read as a whole. Thus, other portions of the contract, specifically reservation of rights clauses, can disambiguate seeming ambiguities. *See International Union of United Auto., Aerospace and Agricultural Implement Workers of America v. Rockford Powertrain, Inc.*, 350 F.3d 698, 704 (7th. Cir. 2003) ("There is no ambiguity in a plan description that states that retirees are currently entitled to . . . insurance benefits, but also that these benefits are subject to change."). The relevant portion of the instant contract is found in Article 8, which is titled "Duration and Amendment of the Plan." Article 8.2 reads:

> Permanence of Plan. Although the Company has established the Plan with the bona fide intention and expectation that it will be able to continue the Plan indefinitely, the Company is not and shall not be under any obligation or liability whatsoever to continue or to maintain the Plan for any given length of time. The Company, through action of its Board may, in its sole and absolute discretion, may discontinue or terminate, in whole or in part, any or all provisions of the Plan in accordance with its provisions at any time without liability whatsoever for such discontinuance or termination.

(Dkt. #87, Warren Aff., Ex. 29 at 32). Article 8.3 grants Alliant similarly broad rights to amend the Plan:

Right to Amend. The Company, through action of its Board, reserves the right at any time and from time to time to modify, alter, or amend, in whole or in part, any or all of the provisions of the Plan, provided, however, that no such modification, alteration or amendment serves to reduce the benefits due and payable to Participants for charges incurred prior to such modification, alteration or amendment.

(Id.). These broad reservation of rights clauses disambiguate any seeming ambiguity as to the intention to vest early retiree or surviving spouse benefits arising from the Introduction, Article 2.12, or Article 11.7. These reservation of rights clauses make it clear that Alliant is free to terminate or amend benefits, thus, meaning those benefits are not vested. *Murphy*, 61 F.3d at 565 ("If a contract provides that benefits can be terminated, then those benefits do not vest."); *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1512 n.2 (10th Cir. 1996) ("[T]he weight of case authority supports . . . that a reservation of rights clause allows the employer to retroactively change the medical benefits of retired participants, even in the face of clear language promising company-paid lifetime benefits.") (cited in *Diehl*, 102 F.3d at 307).

Plaintiffs attempt to assert that these reservation of rights clauses are inapplicable because the Union did not negotiate the reservation of rights language. Plaintiffs liken the reservation of rights clauses "to a contract between an employer and a third party insurer containing a reservation of rights clause that the Union was not involved in drafting, which the *Bidlack* court, 993 F.2d at 666, found to be inapplicable." (Pls.' Br. Supp. Mot. S.J. at 17). This statement is simply incorrect. Plaintiffs themselves argue, correctly, that the Plan B document is part of the CBAs

-17-

because its terms are negotiated during the CBA negotiations. This argument is utterly incongruous with plaintiffs' argument that the reservation of rights clauses in the Plain B document are like a clause in a contract between an employer and a third party, for the fact that the document is incorporated into the CBAs means that it is part of the of the same contract as the CBAs - a contract between plaintiffs and defendants, not between defendants and a third party. Plaintiffs cannot assert that the document is part of the contract, but then also argue that selected portions of that contract do not apply. *Rockford Powertrain*, 350 F.3d at 704 ("Unfortunately for the plaintiffs, the incorporation of the insurance plan into the CBA requires the incorporation of all clauses contained in the plan description, including the reservation of rights clause.").

Plaintiffs also argue that the reservation of rights clauses found in Articles 8.2 and 8.3 do not apply because of language found in Article 8.1 which states: "General. The Plan shall continue in full force and effect unless terminated, modified, altered or amended by the Company as provided in this Article and as allowed by the collective bargaining agreement in effect between the Union (IBEW Local 965) and the Company." (Dkt. #87, Warren Aff., Ex. 29 at 32). Plaintiffs' argue that the phrase "as allowed by the [CBA]," limits Articles 8.2 and 8.3, because the "Agreement" portion of the CBA states: "If amendment is desired, the contents of the amendment must be submitted in writing by either party hereto to the other not later than sixty (60) days prior to said annual expiration date." (Dkt. #82, Warren Aff., Ex. 4 at 1). However, as plaintiffs admit, the only portion of the CBAs that

-18-

references retiree health benefits is the Plan B document and the SPDs, which are incorporated into the CBAs. As previously explained, when the Plan B document was incorporated into the CBAs, all of it was incorporated, including Articles 8.2 and 8.3. Thus, when Article 8.1 says that the plan can be altered or modified "as provided in this Article and as allowed by the [CBA]," that encompasses Articles 8.2 and 8.3 because they are part of the CBA. Thus, the changes imposed by Alliant that gave rise to this suit were implemented as provided in Article 8 of the plan, and as allowed by the CBA – specifically Article 8 of the Plan B document, which is part of the CBA. To read that these changes could not be implemented as they were, as allowed by Articles 8.1 and 8.3, but rather that they had to be implemented through written proposal would be to render Articles 8.2 and 8.3 meaningless. Such a result is not concordant with the method of contractual interpretation adopted in the federal courts. Rather, as previously explained, "when potentially conflicting provisions coexist within . . . a single contract formed of several documents, the rule that contractual provisions be read as parts of an integrated whole will lead a court to seek an interpretation that reconciles those provisions." *Diehl*, 102 F.3d at 307. The amendment procedure set out in the "Agreement" portion of the CBA is the general procedure for amendment to the CBA; however, Articles 8.2 and 8.3 are the specific amendment procedures set out for the Plan B document portion of the CBA – this interpretation renders no portion of the contract meaningless, and best reconciles the potentially conflicting provisions. *See generally Taracorp, Inc. v. NL Industries,*

*Inc.*, 73 F.3d 738, 745-46 (specific sectional language supercedes general language).

In turning to the various SPDs cited by plaintiffs, supra pages 3-4, the court is greatly aided by the table submitted by defendants detailing each individual plaintiff, the date of retirement, which CBA they retired under, as well as citations to the various SPDs they received. (Dkt. #105, Warren Aff., Ex. 10). These details ensure that indeed all plaintiffs did receive SPDs with reservation of rights clauses adequate to disambiguate any seeming ambiguities as to the vesting of health benefits. Indeed, the reservation of rights clauses cited therein make it clear that employees were routinely informed that Alliant retained the right to alter benefits at anytime. (Id.) (quoting each applicable reservation of rights clause, and detailing which plaintiffs received which SPDs). Defendants do concede that a few SPDs were issued that did not contain reservation of rights language (Defs.' Br. Supp. Mot. S.J. at 28). Yet this is not fatal to defendants' position, *see Sprague*, 133 F.3d at 401-402 (employer not required to disclose in SPDs that plaintiffs' benefits were not vested), especially considering the fact that the overwhelming majority of the SPDs plaintiffs received did contain reservation of rights clauses, and that plan descriptions must ultimately yield to the terms of the plan itself. Plaintiffs attempt to avoid the ramifications of the reservation of rights clauses by arguing that they were unilaterally imposed upon plaintiffs. However, as with the Plan B document, plaintiffs are the ones asserting the SPDs are incorporated into the CBAs. Additionally, plaintiffs had ample opportunity to protest these clauses and to negotiate their

-20-

removal in CBA negotiations, yet, from the record before the court, they did not do either. *See Rockford Powertrain*, 350 F.3d at 705 (holding that plaintiffs' arguments that they should not be held to reservation of rights clauses in plan descriptions, since the descriptions were "unilaterally imposed," were unavailing because plaintiffs "had the opportunity to negotiate for the removal of the reservation of rights clause."). The only SPDs that plaintiffs point to which would perhaps avoid the reservation of rights clauses, would be the so called "CIGNA SPDs" which contain the following clause under the heading "Early Retiree Eligibility":

> Notwithstanding any provision of this Plan to the contrary, you are eligible to continue participating in this Plan upon your termination of employment if you: (I) were covered under this Plan on the date of your termination of employment; (ii) you completed at least ten consecutive years of service with WPL or another Alliant Energy Company; and (iii) you attained age fifty-five on or before the dates of your retirement. If you meet these three requirements you are referred to as an eligible retiree.

(Dkt. #87, Warren Aff., Ex. 23 at 40, Ex. 24 at 38, Ex. 25 at 46). Plaintiffs assert that "[a] Class Member could reasonably interpret the phrase 'notwithstanding any provision of this Plan to the contrary...' as including the reservation of rights clause." (Pls.' Br. Opp. Defs.' Mot. S.J. at 10). This assertion is undeniably true. However, from this plaintiffs conclude that "this means that the benefit would be provided so long as the three criteria are met irrespective of the reservation of rights language." (Id.). This, however, is not true, for the passage does not say a retiree will receive any given benefit if they meet the criteria, rather it says that they will remain eligible for the plan. If the plan is changed by the employer, pursuant to the reservation of

-21-

rights clause allowing this to be done, then the retirees' benefits will change, for this clause only ensures that they will remain eligible for the plan, not that the plan will not change or even end.

The reservation of rights clauses in the Plan B document and in the SPDs are as much part of the CBAs as the passages plaintiffs attempt to rely upon to show a vesting of benefits. However, the court finds these express reservation of rights clauses make it clear that the benefits were not intended to vest.

### 3. Coverage vs. Price Parity

The court explained above that, if there were any ambiguities as to whether health benefits for early retirees or surviving spouses vested, these ambiguities are disambiguated by the extensive reservation of rights clauses. However, even if the language relied on by plaintiffs did evidence an intent to vest any health benefits, the only portion of the benefit to vest would be the right to enjoy coverage equivalent to that of active employees, not premium pricing equivalent to that afforded active employees. The 1997, 2001, and 2003 Plan B SPDs state:

> If you were hired prior to January 1, 1993 and retire before you are 65 years old, you and your eligible dependent(s) continue to receive the same medical coverage as active employees.

> If you are covered by an HMO or POS on your early retirement date, you can remain covered by the HMO or POS until the first of the month in which you turn age 65.

> If covered by an HMO or POS, your HMO or POS coverage ceases the first of the month in which you turn age 65.

Case 2:07-cv-00169-JPS    Filed 02/26/09    Page 22 of 25    Document 110

(Pls.' Br. Supp. Mot. S.J. at 4-5). Just as with the above cited CIGNA SPDs, there is nothing in this provision that would vest the right to be covered at the same rate as active employees, but rather, if anything vested, it would be the right to the same level of coverage, which has not been altered. Plaintiffs assert that under the plans early retirees did pay the same as active employees; however that would not vest the right to continue doing so. Indeed, in the passage referencing coverage until age sixty-five, it is the alleged promise of guaranteed coverage until age sixty-five that would give rise to vesting (were it not for the reservation of rights clauses). However, plaintiffs have not cited any language dealing with premium rates that would similarly suggest vesting of a right to premium parity. Rather, plaintiffs simply state that retirees did pay the same premiums as active employees. Given the reservation of rights clauses, there is no reason to suggest that those premiums could not be changed, as they indeed were.

## III. CONCLUSION

For the foregoing reasons, the court is obliged to deny the plaintiffs' summary judgment motion, and grant the defendants' summary judgment motion. Though the court's analysis and ultimate decision largely revolved around tenets of contractual construction, the court is well aware of the harsh real world consequences this decision carries for the plaintiffs and their families. At the same time, in an effort to spare the parties from the expense and uncertainty attendant to litigation of this nature, the Seventh Circuit made it clear in *Bidlack* (decided in 1993) that if CBAs were silent as to the vesting of health benefits, then it would be presumed that

-23-

benefits did not vest.  This holding put unions on notice of the necessity of ensuring that explicit vesting language appeared in the CBAs they negotiate.  *Rossetto*, 217 F.3d at 544 ("For as word of the *Bidlack* presumption spreads and [CBAs] are renegotiated, it will become obvious to unions that if they want to assure that employer-paid health benefits for workers they represent are vested, they will have to insist on explicit language to this effect.").  Indeed, the *Bidlack* presumption made it clear that to rely on oral representations that vesting was "already in the contract," or to rely on language that may suggest vesting in other documents that may be incorporated by reference into the CBAs was to risk the outcome that plaintiffs are confronted with today.   Indeed, each of the CBAs at issue in this case was negotiated after the publishing of the *Bidlack* decision, and yet none of the CBAs contain explicit language as to the vesting of employer-paid health benefits. Conversely, while defendants did have the *Bidlack* presumption and the reservation of rights clauses in their favor, defendants could have avoided this litigation entirely if they had followed the formula set forth in *Corrao* to eliminate any patent ambiguity by adding the phrase "unless the collective bargaining agreement has expired" or "during the term of this agreement" following language that might suggest vesting. *Rossetto*, 217 F.3d at 544.

Accordingly,

**IT IS ORDERED** that plaintiffs' Motion for Summary Judgment (Docket #81) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that defendants' Motion for Summary Judgment (Docket #79) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** on its merits together with costs as taxed by the Clerk of the Court.

Dated at Milwaukee, Wisconsin, this 26th day of February, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge